UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

MERIAM FAROK,　　　　　　　　　　　　　　　　　　CIVIL NO. 04-2660 RHK/AJB

　　　　　　PLAINTIFF,

　　　　　　　　　　　　　　　　　　　　　　　　　　REPORT AND RECOMMENDATION
V.　　　　　　　　　　　　　　　　　　　　　　　　ON PARTIES CROSS-MOTIONS FOR
　　　　　　　　　　　　　　　　　　　　　　　　　　SUMMARY JUDGMENT
JO ANNE B. BARNHART, COMMISSIONER
OF SOCIAL SECURITY,

　　　　　　DEFENDANT.

_____

CARL E. ELOFSON, ATTORNEY FOR MERIAM FAROK.

LONNIE F. BRYAN, ASSISTANT UNITED STATES ATTORNEY, FOR THE COMMISSIONER.

_____

**I.　　Introduction**

　　　　Plaintiff Meriam Farok (Farok) appeals the unfavorable decision of the Commissioner of Social Security Agency (Commissioner) denying her application for supplemental security income (SSI).  This matter is properly before the court, United States Magistrate Judge Arthur J. Boylan, for a report and recommendation to the district court on the parties cross-motions for summary judgment.  *See* 28 U.S.C. § 636 (b)(1) and Local Rule 72.1.  Based on the reasoning set forth below, this court **recommends** that Farok's Motion for Summary Judgment [Docket No. 13] be **denied** and that the Commissioner's Motion for Summary Judgment [Docket No. 21] be **granted**.

**II.　　ADMINISTRATIVE PROCEDURAL HISTORY**

　　　　Farok protectively filed an application for SSI on August 21, 2000, alleging a disability onset date of July 1, 1998, due to asthma, chronic headaches, problems with her wrists, and a thyroid

1

disorder. (Tr. 79, 104.) Her claim was denied initially, on reconsideration and after a hearing before an Administrative Law Judge (ALJ). Farok then requested a review by the Appeals Council. The Appeals Council granted her request and remanded the matter to an ALJ for further proceedings.[1] (Tr. 45-46.) After a second hearing, the ALJ again denied Farok's claim.[2] (Tr. 24.) The Appeals Council denied Farok's request for review of the second ALJ's determination of nondisability. (Tr. 5.) Thus, the second ALJ's decision is the final decision of the Commissioner. Farok has properly filed a motion with the Federal District Court, District of Minnesota, requesting the district court overturn the decision of the Commissioner and direct a finding of disability. (Pl. Mem. at 6.) The Commissioner has filed a motion requesting that the court affirm the decision of the ALJ and grant summary judgment in favor of the Commissioner.

**III.     SUMMARY OF EVIDENCE**

Farok was born on May 5, 1961, and was forty-one years old at the time of the hearing before the ALJ. She is from Kurdistan in the Northern region of Iraq. (Tr. 336.) She spent some time in a refugee camp in Turkey. (Tr. 120, 336.) She immigrated to the United States in 1992 and is a naturalized United States Citizen. She worked briefly as a dishwasher in 1997. (Tr. 337.) In 1999 to 2000, she did volunteer work at a local school.[3] (Tr. 346.) At the time of the administrative hearing she was attending school in order to obtain her GED. (Tr. 355.)

---

[1]     The Appeals Council determined that the ALJ had failed to properly consider Farok's metal impairments in his assessment of Farok's RFC. (TR. 45.)

[2]     The second hearing was conducted by a different ALJ then the ALJ who conducted the first hearing.

[3]     The volunteer work is apparently a requirement for receiving Aid for Families with Dependant children (AFDC). (Tr. 346.)

Farok has been diagnosed with asthma, carpal tunnel syndrom, and tendinitis in the forearm. She has also been diagnosed with Adjustment Disorder with Anxiety and Depression and Major Depressive disorder, single episode. (Tr. 317, 321.) Her thyroid gland was removed in January 2000. (Tr. 343.) Farok claims that some of her problems arose from her exposure to toxic chemicals in Iraq and Turkey. (Tr. 345.) This exposure has left her with some breathing problems that have been diagnosed alternatively as asthma and bronchitis or bronchospasm. (Tr.165, 167.) In addition, some of her medical problems relate back to two separate motor vehicle accidents that occurred in February 1996 and September 1999. (Tr. 148, 160, 165, 341.) In the first accident, Farok hit the windshield with her head. (Tr. 341.) This has resulted in Farok complaining of chronic headaches. (Tr. 341.) The second accident caused some neck and shoulder injuries. (Tr. 342.) This has resulted in complaints of neck and shoulder pain and difficulty in moving her neck. (Tr. 343.) Farok also has had problems with her hands and wrists and has undergone surgery on her wrist. (Tr. 298.)

Farok is married and has six children with ages at the time of the hearing ranging from 8 to 19 years old. (Tr. 337.) Her husband is disabled and receives benefits from the Social Security Agency. (Tr. 359.) Farok testified that she can drive a car up to ten miles, she attends school for twenty hours a week, and that she cooks for her family everyday. (Tr. 336, 338, 345.) She testified that she has difficulty lifting, grasping, and squeezing. (Tr. 341.) She stated that she cannot tolerate chemical fumes and that her children do all of the cleaning and laundry so that she can avoid the fumes from the detergent and cleansers. (Tr. 382.)

Farok testified to using two different inhalers for her asthma. In addition, she testified that she is using eye drops for glaucoma and takes Advil and Tylenol for pain. She also has prescriptions for

3

Vioxx[4] and cyclobenzaprine[5] for pain relief.

Farok's son, Jegir, who was nineteen years old at the time of the hearing, testified at the hearing. (Tr. 393.) He testified that his sisters do most of the housework and laundry. (Tr. 360.) He stated that his mother helps separate the laundry once it is washed and makes dinner for the family everyday. (Tr. 361.) He explained that his sisters do the lifting of the heavy pots and pans. (Tr. 361.) He said that the family plays poker together for fun. (Tr. 362.)

Farok presented medical records from her treating medical sources. The medical records for Dr. Stuart R. Topley, from the Moorhead Clinic, Dakota Clinic in Fargo, North Dakota, cover multiple visits from April 27, 1999. In October 1999, an enlarged thyroid was identified, otherwise, the CT examination was negative for the chest and upper abdomen. (Tr. 284.) Farok underwent a thyroidectomy in early 2000. (Tr. 277.) After the surgery, an exam was completed that revealed no abnormalities. (Tr. 277.) A cervical spine examination was normal, with no herniation or compromise to the spinal cord. (Tr. 275-76.) An esophagram and upper gastrointestinal examination was performed on May 30, 2000, which indicated minimal intermittent gastroesophagael reflux, otherwise negative. (Tr. 274.) An examination of the hands was conducted on June 20, 2000, with no significant

---

[4] Vioxx is a nonsteroidal anti-inflammatory drug that was prescribed for acute pain. *The PDR Family Guide to Prescription Drugs* 728 (8th ed. 2000). It has since been voluntarily withdrawn from the market by its manufacturer due to safety concerns. *MedlinePlus Drug Information* at http://www.nlm.nih.gov/medlineplus/druginformation.html.

[5] Cyclobenzaprine, sold by the brand name Flexeril, is "a muscle relaxant [that] is used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries." MedlinePlus Drug Information at http://www.nlm.nih.gov/medlineplus/druginformation.html.

abnormalities seen. (Tr. 268.)

In May 1999, Dr. Dennis Lenhart, Jr., examined Farok because of complaints of pain in the right dorsal wrist. (Tr. 244.) Dr. Lenhart noted that the x-rays revealed normal articular alignment and bony structure. (Tr. 244.) He stated that "the exact etiology of the wrist pain was unclear but may be related to a symptomatic ganglion." (Tr. 244.) In April 1999, Farok had the ganglion removed as well as a tenosynovectomy[6]. (Tr. 242.) According to the medical records, Farok's recovery from surgery went well with "good relief of the pain in the area although her main problem [was] increased stiffness." (Tr. 241.) The stiffness was noted to be likely due to the surgical procedure. (Tr. 241.) After surgery, however, some pain continued and a rheumatological screen was conducted to determine whether the ongoing pain was due to a possible auto immune or connective tissue disorder. (Tr. 241.) The screens were normal. (Tr. 240.) In October 1999, Farok was diagnosed with bilateral carpal tunnel syndrom. (Tr. 240.) In December 1999, Dr. Sami Mughni noted that Farok had minimal tenderness with minor cystic swelling of the wrist, but the range of motion was normal. (Tr. 223.) Her wrist pain was treated with Vioxx. (Tr. 223.) In March 2000, she was given an injection of Celestrone and lidocaine into the wrist and she was instructed to continue to wear a wrist brace. (Tr. 205.) It was noted at that time that she was able to "flex and extend all digits and move[] the wrists quite freely." (Tr. 209.) In 2002, a neurological exam was completed that ruled out carpal tunnel syndrome and opined that Farok's symptoms may more likely be "musculoskeletal or tendinous in nature." (Tr. 325.)

In September 1999, Farok presented with neck pain and headaches due to injuries sustained in

---

[6] Tenosynovectomy is the surgical excision of a tendon sheath. MedlinePlus Medical Dictionary at http://www.nlm.nih.gov/medlineplus/mplusdictionary.html.

an automobile accident. (Tr. 235.) Dr. Joseph T. Burns noted pain along the trapezius, but no vertebral bony tenderness and the extension and rotation of the head was accomplished with minimal limitation. (Tr. 235.) In December 1999, Jason Schwengler, a physical therapist, noted that Farok had a 75% range of motion, with improved mobility and an improved tolerance to side tilt stretching. (Tr. 219.) On February 29, 2000, a neurological exam was completed by Dr. Steven C. Julius. (Tr. 213.) Dr. Julius noted that there was mild weakness in the left hand and decreased sensation in the left thumb and index finger, but Farok's neck was supple with full range of motion and she demonstrated good coordination. (Tr. 213.) He noted that exams completed in 1996 and 1997 had been normal. (Tr. 213.) Additional physician assessments indicate mostly normal examination results with some minor problems. For example, the records indicate: flexion and extension were normal, slight decrease in right rotation and right lateral flexion (Tr. 160); vital signs normal, neck range of motion is reasonable, extension causes some discomfort (Tr. 157); tenderness in the neck, paraspinal spasm, some discomfort in movement, range of motion is reasonable (Tr. 139).

    Farok has also been seen for shortness of breath, asthma and bronchiolitis due to toxic gas inhalation. (Tr. 229.) Treatment notes indicate that her lungs were clear on December 1999. (Tr. 229.) In May 2000, a CT scan indicated no evidence of airway constriction. (Tr. 194.) In June 2000, Dr. Donald J. Matthees, stated that tests indicated that Farok's lungs were clear and that she had a "very mild air flow obstruction." (Tr. 191.) Treatment notes for the remainder of 2000 indicate much the same: harsh breathing sounds, scattered expiratory wheezes, examination revealed clear chest (Tr. 155); frequent coughing, tympanic membranes normal, pharynx is unremarkable (Tr. 153); chest is clear with good air entry, head and neck examination is negative, no evidence of dyspnea (Tr. 151).

Dr. Alan Suddard, an agency consultant, completed a physical residual functional capacity assessment in October 2000.  Dr. Suddard concluded that Farok had the residual functional capacity to occasionally lift 50 pounds, frequently lift 25 pounds, stand or sit six hours in an eight hour work day, with limitations to no repetitive hand or wrist motions, avoiding even moderate exposure to extreme cold or fumes, with no limitations on pushing or pulling, and no postural or visual limitations.  (Tr. 289-95.)  Dr. Dan Larson reviewed Dr. Suddard's evaluation and agreed with his assessment.  (Tr. 295.)

Dr. Topley completed a Doctor's Statement form.  (Tr. 299.)  Dr. Topley diagnosed Farok as having asthma, carpal tunnel syndrom, hypothyroidism, and tendinitis of the forearm.  (Tr. 299.)  According to the Dr. Topley, Farok is limited to working twenty hours a week.  (Tr. 299.)  In the comments area, the physician notes that Farok is the primary care giver for her children, that her husband suffers from health problems, and that her husband does not speak English.  (Tr. 299.)  There is no physical limitation noted to explain the stated exertional limitation placed on Farok's work capacity.  (*See* Tr. 299.)

A psychological evaluation was completed on August 12, 2002.  (Tr. 318.)  Dr. Ronald L. Odden, a licensed psychologists, diagnosed Farok as meeting the criteria for a Major Depressive Disorder and Posttraumatic Stress Disorder, Chronic Type, although the doctor is uncertain of the diagnosis of Posttraumatic Stress Disorder.  (Tr. 319-20.)  Dr. Odden administered several test but found the results unreliable because Farok had "over endorsed symptoms on many of the scales and showed such severe psychological turmoil that was not consistent with her presentation in the examination this day." (Tr. 320.)  He also noted that Farok's prognosis was guarded because she did not seem motivated to work with mental health professionals in managing her mood disorder.  (Tr.

7

321.)  Dr. Odden concluded that Farok would be able to (1) understand, remember and follow instructions for tasks with three steps on a consistent basis, (2) focus on tasks for 45 minutes at a time, and (3) return to a task repeatedly until the task is completed for the majority of the time.  (Tr. 321.)

The record also contains notes from Farok's visits to Lutheran Social Services.  (Tr. 300-13.) During the counseling sessions, Farok explained that she was upset by the anger between her and her husband's family.  (Tr. 301.)  She discussed her problems with her relationship with her husband.  She told the counselor that she did not trust her husband with the children because she felt that he was not capable of taking care of them.  (Tr. 312.)  She also talked about past physical abuse at the hands of her parents, citing dealing with this issue was her main concern.  (Tr. 301.)  The counselor notes that Farok was happy and feeling better physically in November 2000.  (Tr. 307.)

At Lutheran Social Services, a diagnostic assessment was completed on April 6, 2000, by Linda R. Hamann MS LP.  (Tr. 314.)  Hamann notes that Farok's processes were logical and coherent.  Her mood was calm, but depressed.  Hamann noted that Farok said that she was having problems with sleeping and she worried about her husband's health.  Hamann observed that there were "no impairments in the social/interpersonal/ future/ achievement sphere."  (Tr. 316.)  Hamann declined to make the diagnosis of a major depressive disorder at that time, explaining that the depressive symptoms could have been related to Farok's thyroidectomy or caused by the stress of her domestic situation.  (Tr. 317.)

### IV.    THE ALJ'S FINDINGS AND DETERMINATION

The purpose of awarding SSI "is to assure a minimum level of income for people who are age

65 or older, or who are blind or disabled." 20 C.F.R. §416.110. The Agency has adopted regulations establishing a five-step procedure for determining whether a claimant is disabled within the meaning of the Social Security Act. *See* 20 C.F.R. § 416.920(a). The Eighth Circuit has summarized these steps as follows:[7]

> The Commissioner must determine: (1) whether the claimant is presently engaged in "substantial gainful activity;" (2) whether the claimant has a severe impairment--one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

*Fines*, 149 F.3d at 895. *See* 20 C.F.R. § 416.920(a)(4). In addition, if the claimant has a medical determined mental impairment, the ALJ must proceed through additional steps as outlined in § 416.920a. According to § 416.920a(c), the ALJ must rate the claimant's degree of limitation in four broad functional areas. § 416.920a(c)(3). These four areas are: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. *Id.* The ALJ must rate the degree of limitations on a five-point scale: None, mild, moderate, marked, and extreme. § 416.920a(c)(4). If by using these ratings the ALJ determines that the impairment is severe, but does not meet a listed impairment, the ALJ must assess the claimant's RFC as described in step four of the determination procedure. § 416.920a(d)(3).

---

[7] Although the summary of the five step procedure in the *Fines* case related to an analysis of disability for disability income benefits, the analysis for a disability under SSI is identical. *Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).

The ALJ reviewed Farok's extensive medical records and determined that Farok has a severe defective disorder, depressive disorder. (Tr. 20.) The ALJ determined that this impairment caused moderate deficits in concentration, persistence and pace. The ALJ found no deficits in maintaining social function and mild deficits in her ability to complete daily living activities. He concluded that Farok "can preform simple routine tasks at production rate pace in unskilled jobs."

The ALJ determined that, along with Farok's mental impairment of major depressive disorder, there was evidence of medically determinable impairments of "obstructive airway disease or dyspnea, bilateral tendonitis of the forearms sometimes described as carpal tunnel or ulnar syndrome, history of cervical spasm, tension headaches sometimes described as nonorganic headaches or neuralgia with no eye complication, history of glaucoma with bilateral pressure of 18, [and a] history of total thyroidectomy with hypothyroidism." (Tr. 20.) The ALJ found that these impairments either singly or in combination failed to meet or equal a listed impairment. (Tr. 21.)

The ALJ then proceeded to steps four and five of the sequential evaluation. The ALJ noted that because Farok has no past relevant work experience, the burden fell to the Commissioner to demonstrate that there were a significant number jobs within the region for which Farok has the RFC to perform. (Tr. 21.) In order to make this determination the ALJ first evaluated Farok's RFC. The ALJ found that Farok's allegations of pain and impairments so severe as to render her disabled were not fully credible and were not consistent with the other evidence of record. (TR. 21.) The ALJ found that Farok

> retains a residual functional capacity for frequently lifting and carrying 25 pounds and she can push or pull within the exceptional range that permits the wearing of corrective lenses. She can occasional lift 50 pounds and she can frequently sit, stand and walk in

> jobs with customary breaks where she can avoid repetitive, prolonged hand motion. [Farok] can perform simple, routine tasks at production rate pace in unskilled jobs where she can avoid extreme cold, fumes, odors, dust, gases and poor ventilation.

(Tr. 22.)  The ALJ noted that this RFC was consistent with the capacity to do medium work with some limitations.  The ALJ concluded, after consulting a vocational expert on whether there are jobs within the region that Farok would be able to perform given the medium range of work with the specified modifications, that there were a significant number of jobs within the region that Farok would be able to perform.  These jobs included, among others, light, unskilled ticket taker, light, unskilled records attendant, light, unskilled counter rental clerk, and light, unskilled maid.  (Tr. 22.)  According to the vocational expert, jobs of these kinds numbered around 717,000 in the region.  (Tr. 400.)  Accordingly, the ALJ concluded that Farok is not disabled as defined under the Social Security Act at any time from August 21, 2000, until the date of the decision.  (Tr. 24.)

**V.    DISCUSSION**

    *A.    Standard of Review*

This court will affirm the ALJ's findings that the claimant was not under a disability if the findings are supported by substantial evidence based on the entire record.  *Haley v . Massanari*, 258 F.3d 742, 747 (8th Cir. 2001).  "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support the decision." *Id*. (quoting *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998)).  The review the court undertakes, however, must go beyond solely the examination of the record for evidence in support of the Commissioner's decision. *Id.*  The court must additionally examine the record for evidence that detracts from that decision. *Id.*  Nevertheless, as long as there is substantial evidence to support the decision, this court will not reverse

it simply because substantial evidence exists in the record that would support a contrary outcome or because this court might have decided differently. *See id.*

  B.  *Analysis of Evidence and ALJ's Decision*

  Farok argues that the ALJ "made findings which were not supported by substantial evidence on the record as a whole" and "failed to follow the regulations, mandated procedures in the Commissioner's own Acquiescence Rulings and the Code of Federal Regulations." (Pl. Mem. at 2-3.) The Commissioner argues that the ALJ's determinations that Farok failed to prove her case and that she could perform a significant number of jobs in the region are supported by substantial evidence. (Def. Mem. at 1.)

  Farok argues that the ALJ failed to grant controlling weight to the opinions of Dr. Topley and Dr. Odden. (Pl. Mem. at 4-5.) Generally, "[a] treating physician's opinion is due controlling weight if that opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Ellis v. Barnhart* 392 F.3d 988, 995 (8th Cir. 2005) (internal quotation marks omitted). Here, the ALJ declined to grant the these opinions controlling weight because they were not well supported by clinical or diagnostic techniques and they were not consistent with other evidence in the record. Tests conducted by Dr. Topley indicated normal results and are not consistent with a finding of disability. In addition, Dr. Topley's statement that Farok could only work 20 hours a seems to be based on Farok's domestic difficulties with her husband and children as opposed to a medical or mental impairments. (*See* Tr. 19.) Farok's comments to the counselor at Luther Social Services also support the finding that her perceived inability to work is based more on her domestic situation than her medical or mental impairment in her inability

to work. (Tr. 312.) A claimant must demonstrate that her disability is based on a medically determinable mental or physical condition. 42 U.S.C. § 1382c(a)(3)(A). An inability to work based on domestic circumstances does not satisfy this requirement. *See id.* Thus, substantial evidence supports the ALJ's decision to decline to grant controlling weight to Dr. Topley's statement.

Farok's argument that the ALJ should have granted controlling weight to Dr. Odden's statement that Farok could not stay on task for more than 45 minutes and that she would likely miss work due to her depressive mood is not persuasive. Although Dr. Odden stated that Farok would have difficulty staying on task and that she would be motivated to call in sick, (*see* Tr. 323), other statements in his report are not consistent with this conclusion. (*See* Tr. 320-21.) Dr. Odden's Medical Source Statement indicates that Farok would be able to function at an entry level position. (Tr. 321.) Thus, the ALJ could properly choose to grant less weight to these specific statements.

Farok also argues that the ALJ failed to consider the objective medical findings when assessing her RFC. (Pl. Mem. at 3.) The objective medical findings in the record, however, are consistent with the ALJ's assessment because most medical tests and evaluations resulted in normal results. (*See, e.g.,* Tr. 137, 148, 160, 172, 191, 193.)

Finally, Farok argues that the ALJ improperly applied the "grids" to determine that she was disabled.[8] (Pl. Mem. at 4.) If a clamant's limitations are based solely on exertional impairments, then the ALJ may base a finding of nondisability on the Medical-Vocational Guidelines (Guidelines). *See Najera v. Sullivan*, 902 F.2d 12, 13 (8th Cir. 1990). If the claimant's limitations, however, include

---

[8] The "grids" refer to the Medical-Vocational Guidelines at 20 C.F.R. Ch. 3, Appendix. 2, Subpart P, Part 404.

nonexertional limitations, then the Guidelines may not be applied as the basis for a determination of nondisability.  *See id.*  Farok mischaracterizes the ALJ's use of the Guidelines.  The record indicates that the ALJ did not base his determination of nondisability on the Guidelines.  Although the ALJ issued a finding that Farok would be considered disabled if based solely on her exertional limitations under the Guidelines, the ALJ proceeded further to explain that the capacity for medium work would be further limited by Farok's nonexertional limitations. (Tr. 24.)  Then, the ALJ clearly expresses that the Guidelines along with other Social Security regulations were used as a "framework" in determining disability.  (Tr. 24.)  The ALJ then incorporated the testimony of the vocational expert in determining that there were jobs within the national economy that an individual with Farok's characteristics would be able to perform.  (Tr. 24.)  *See Najera*, 902 F.2d at 13 (noting that when nonexertional limitations are present, expert vocational testimony must be used to establish that there are jobs available in the national economy for a person with the claimant's characteristics).  Thus, the ALJ did not rely solely on the Guidelines in determining that Farok did not satisfy the criteria for SSI, but properly used the expertise of the vocational expert to make this determination.

## VI.    RECOMMENDATION

For the foregoing reasons, this court **recommends** that Farok's Motion for Summary Judgment [Docket No. 13] be **denied** and that the Commissioner's Motion for Summary Judgment [Docket No. 21] be **granted**.

Dated: April 15, 2005

s/ Arthur J. Boylan

>Arthur J. Boylan
>United States Magistrate Judge

Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection. This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals. Written objections must be filed with the Court before May 2, 2005.